WORTH BROS. CO. v. LEDERER, Collector of Internal Revenue.

(District Court, E. D. Pennsylvania. February 28, 1919.)

No. 5738.

INTERNAL REVENUE ⬉9—"MANUFACTURE OF SHELLS."

   A steel company, which manufactured billets for shells, piercing the billets, so as to make rough forgings, *held* engaged in manufacture of shells, within Act Sept. 8, 1916, § 301 (Comp. St. 1918, § 6336¼b), imposing an excise tax on such business, though the rough forging required much more work before shells were completed.

At Law. Action by the Worth Bros. Company against Ephraim Lederer, Collector of Internal Revenue. Judgment for defendant.

Joseph D. McCoy and A. H. Wintersteen, both of Philadelphia, Pa., for plaintiff.

Robert J. Sterrett, Asst. U. S. Atty., and Francis Fisher Kane, U. S. Atty., both of Philadelphia, Pa., and Wm. L. Frierson, Asst. Atty. Gen., for defendant.

THOMPSON, District Judge. A trial was had in this case by the court without a jury under a stipulation of the parties. The plaintiff, Worth Bros. Company, brought suit against the defendant, the collector of internal revenue for the First district of Pennsylvania, to recover taxes paid under protest, amounting to $74,857.70, with interest from July 25, 1917, and levied and assessed against the plaintiff and collected under the provisions of section 301 of title III of the Act of September 8, 1916, c. 463, 39 Stat. 781 (Comp. St. 1918, § 6336¼b). The section under which the tax was imposed is as follows:

"Sec. 301. (1) That every person manufacturing (a) gunpowder and other explosives, excepting blasting powder and dynamite used for industrial purposes; (b) cartridges, loaded and unloaded, caps or primers, exclusive of those used for industrial purposes; (c) projectiles, shells, or torpedoes of any kind, including schrapnel, loaded or unloaded, or fuses, or complete rounds of ammunition; (d) firearms of any kind and appendages, including small arms, cannon, machine guns, rifles, and bayonets; (e) electric motor boats, submarine or submersible vessels or boats; or (f) any part of any of the articles mentioned in (b), (c), (d), or (e)—shall pay for each taxable year, in addition to the income tax imposed by title I, an excise tax of twelve and one-half per centum upon the entire net profits actually received or accrued for said year from the sale or disposition of such articles manufactured within the United States: Provided, however, that no person shall pay such tax upon net profits received during the year nineteen hundred and sixteen derived from the sale and delivery of the articles enumerated in this section under contracts executed and fully performed by such person prior to January first, nineteen hundred and sixteen."

The plaintiff is a corporation of Pennsylvania engaged at Coatesville in the manufacture of iron and steel. The Midvale Steel Company entered into a contract with the French government to manufacture and sell to it a large quantity of high explosive shells of four sizes— 220-millimeter, 270-millimeter, 280-millimeter, and 293-millimeter.

The type of explosive shells contracted for by the French government is a composite structure, consisting of the following distinct parts:

(1) The steel shell body in one piece, cylindrical in shape, nosed in at the top, so that with the nose fuse it comes to a point with what is called the ogival head.

(2) A copper driving band set into an inset groove near the base of the shell body, and projecting slightly beyond it, to engage lands or rifling in the bore of the gun.

(3) A nose timing fuse, which is a highly complicated work of mechanism, which is screwed into the throat of the shell body.

(4) A high explosive charge, to be contained in the shell body.

The shell as a whole is a very carefully manufactured and highly finished piece of mechanism, the parts of which must be adjusted to each other with the greatest accuracy and care. The steel of which the shell body is composed must be within such limits of textile strength as to withstand the shock of fire, but to burst when the charge content is exploded. Its weight, when finished, must be, within a certain tolerance, exact; its exterior and interior must be absolutely centered or true to the longitudinal axis of the shell. The thickness and weight of the material must be so distributed as to have such uniformity of balance as to give uniformity and steadiness in flight. Beginning with the steel ingot, which was the first form in which, under the contract with the French government, its inspectors passed upon the material as it progressed towards completion, its manufacture comprised 34 steps. The Midvale Steel Company ordered from the plaintiff steel forgings, which represented the fifth step in the manufacture subject to French governmental inspection, and the plaintiff manufactured the shell forgings at its plant at Coatesville.

The tax in controversy was levied and collected from the plaintiff upon its profits in the sale of the manufactured shell forgings, upon the claim that the profits accrued in the manufacture of parts of shells.

The plaintiff's plant consisted of blast furnaces, an open hearth steel plant, steel plate mills, a blooming mill, at which they produced pig iron, steel ingots, plates for all purposes, steel blooms, forge blooms, bars, skelp, tubes, and shell forgings. The main production of the plant was steel plates.

Under the order of the Midvale Steel Company the shell forgings in controversy were to be manufactured according to the specifications of the French government, which were part of its contract with the Midvale Steel Company. In order to equip the plaintiff's plant for the work, it was necessary to, and the plaintiff did, install special machinery adapted for forgings of the character required, at a cost of about $2,000,000. The stages of the work done by the plaintiff were as follows:

(1) Smelting the ore in the blast furnace into pig iron, without, however, running it into the moulds which would form what are commercially known as "pigs."

(2) In its molten state transferring it with a ladle into an open hearth furnace, where it was converted into steel, and tapped out of the furnace, and conveyed into moulds in the form of ingots.

(3) Heating the steel ingot to the proper temperature for rolling, when it was rolled in the blooming mill into rounds or blooms.

(4) The rounds or blooms were then cut with a hot saw into billets of sufficient length, diameter, and weight to produce the required shell forging. At this point the French inspectors inspected each individual billet, to determine whether there were defects in the steel, such as piping or blow holes. After acceptance of the billets so tested, they were chipped to determine whether surface defects existed. At this stage the steel billet, which was the material which was to become the shell forging, is cylindrical in shape, of approximately two-thirds of the outside diameter of the shell forging to be produced, and approximately one-third of its length.

(5) The billet was then taken to the forge shop, heated from two to three hours in a continuous furnace, and placed in the container or die of a hydraulic piercing press. It was pierced, while hot, by a piercing bar entering one end and pushing its way to within sufficient distance of the other end to leave a closed end or base. During this process the metal, being heated to about 2,100 degrees, is viscous, so that the metal is pushed up the sides of the die or container. The product of this process was a cylindrical forging, hollow, with one closed and one open end.

(6) The forging was then taken to a horizontal hydraulic bench and drawn, while the metal was hot, so as to increase its length and conform its inside and outside diameter to the required size of the forging ordered by the Midvale Steel Company.

The product of manufacture by the plaintiff was a rough steel forging, cylindrical in shape, hollow, having one closed end. In order to fit it for delivery to the French government, it was necessary for it to go through a large number of heating, forging, and machining processes before it became a finished, completed, shell body. These processes were carried on after delivery to the Midvale Steel Company at its plant, and were 29 in number. Without going into detail as to each process, they were as follows:

(1) Slicing excess length off the open end.

(2) Centering over a mandrel by the inside surface and drilling a hole in the base for working upon a lathe.

(3) Rough-machining the outside approximately concentric with the bore.

(4) Finish boring in a boring lathe, to make the inside concentric with the outside.

(5) Recentering the base, in order to take the next step of

(6) Finish—turning, to bring the inside and outside surfaces concentric.

(7) Cutting or facing the base or outside of the closed end, to bring it to the proper thickness.

(8) Slicing the excess length off the open end, to make the forging accurate in length.

(9) Hand-grinding off any roughness left on boring or turning the interior.

(10) A very important step in bringing the upper end of the cylindrical forging to the pointed form of a shell body. This step is known as "nosing." It consisted in heating the shell in a furnace having circular doors for a proper distance back from the open end, and then placing it in a forging press with a conical or ogival shaped die, so that it assumed the contour of a Gothic arch at the top. This forging process while the metal was hot caused the pressing in of the metal, so as to produce a graduated thickness, increasing as the diameter of the pointed end decreased.

(11) Annealing, which consists in heating and slowly cooling the metal, making it soft and tough.

(12) Sand-blasting the exterior of the shell, to remove the scale produced by the former heating process.

(13) Heating above the "critical temperature," and quenching the heat in a volume of water, for the purpose of hardening the metal.

(14) Heating in a gas furnace, to remove the excess brittleness associated with the hardness; the object being to give the shell the proper degree of toughness and hardness, to enable it to withstand the impact of the discharge in the gun, and to be shattered by the force of the high explosive content upon reaching its objective point.

(15) Testing for hardness of the metal by a Brindell testing machine. This test is to determine uniformity of hardness of the metal of the shell.

(16) Sand-blasting inside and outside, to get off the rough scale of the heat treatment.

(17) Cutting or facing off in length at the nose to its assigned length, and boring and threading the throat or aperture in the open end of the shell. The threading is for the purpose of screwing into place the fuse, and a shoulder is left in the interior for a gas check seat. The thread is cut above the seat.

(18) Cutting the threads accurately by means of a hand tap or cutter.

(19) Placing the shell on two horizontal machine-ground bars of steel and rolling it along, to determine through counteracting weights on the interior the balance of the shell, and, if the weight is found to be properly distributed, recentering the base to correspond. This step is necessary in order to procure accurate flight of the shell.

(20) After recentering, re-turning the shell, so as to bring it to accurate cylindrical shape.

(21) The shell having been balanced up and re-turned, turning the cylindrical body to finished size.

(22) Turning the ogival head to its finished size.

(23) Grinding the bourrelet. The French shell is made with a diameter at the rear of the head which is slightly larger than the body back of it, and that maximum diameter is called the "bourrelet." Its diameter is made to fit the top of the lands or ribs of the rifling of the gun. This maximum diameter at the head, corresponding with that of the projecting copper band encircling the shell body near its base, causes the projectile to fit the lands, and gives the remainder of the body of the shell a clearance, avoiding friction.

(24) Cutting the band seat. This is an inset groove cut around the body of the shell near its base, into which the copper band is hammered.

(25) Facing the base to the length which will give the final weight that the shell must have.

(26) Boring the throat, below the shoulder which had been left therein, to remove any roughness.

(27) Subjecting the shell to interior hydrostatic pressure—(1) to determine whether there is any leak in the base which would permit the gas from the powder, when it is discharged, finding its way into the cavity of the shell and prematurely bursting it; (2) to determine whether there are any cracks due to the heat treatment; (3) to determine whether the steel is of the necessary tensile strength to withstand the shock of fire.

(28) Giving the shell a bath of oakite to prevent rusting.

(29) Testing in a sound-proof room, to determine by the ring whether it is cracked.

The remaining processes have to do with fitting the copper band upon the shell.

It has been thought necessary to recite in detail the various steps required in the manufacture of the finished shell body, in order to fully demonstrate the difference in physical characteristics and fabrication between the rough steel forging delivered to the Midvale Steel Company and the finished shell body when ready for delivery to the French government.

In the rough steel forging was contained all of the material that was finally contained in the completed shell body without the copper band; but a large part of the exterior and interior metal was removed by machining, to make it conform in size, weight, and finish to specifications for the completed product. In case of 220-millimeter shells, for example, the forgings delivered by the plaintiff were approximately in outside diameter, 9⅜ inches; inside diameter, 7 inches; length, 32¾ inches; weight, 351 pounds. The 220-millimeter shells, after fabrication had been completed by the Midvale Steel Company, were approximately of the following dimensions and weight: outside diameter, 8.60 inches; inside diameter, 7.36 inches; length, 29.53 inches; weight 160 pounds.

The forgings had to be subjected to processes of cutting to proper length, latheing, and boring to proper inside and outside diameter, forging to produce the ogival head, annealing, hardening, machining to proper contour, machining and hand-finishing the threads, shoulder, and throat, and finishing by sand-blasting and other processes to render the surface smooth and clear of scale and roughness. Measured in dollars, the plaintiff did about 40 per cent., and the Midvale Steel Company about 60 per cent., of the work on the shell bodies supplied to the French government by the Midvale Steel Company.

After leaving the plaintiff's plant, the metal was increased in tensile strength from 85,000 pounds to a minimum of 113,780 pounds.

The question is whether the manufacturing done by the plaintiff

brings it within the terms of section 301 of the title under which the tax was assessed and collected, which provides:

"(1) That every person manufacturing * * * (c) * * * shells * * * of any kind, * * * loaded or unloaded, * * * or (f) any part of the articles mentioned in * * * (c) * * * shall pay for each taxable year * * * an excise tax of twelve and one-half per centum upon the entire net profits actually received or accrued for said year from the sale or disposition of such articles manufactured within the United States."

In view of the physical changes through the application of labor, skill, and science in manufacturing necessary to develop the shell forging into the finished shell body, it cannot be contended that the shell forging delivered to the Midvale Steel Company was a "part" of a shell, in the sense of being adapted and ready for assembling with other parts to make a complete shell. It could not be used as a shell body until it underwent at least a large part of the steps of manufacture which the Midvale Steel Company put upon it. If "manufacturing" is used in the sense of completing manufacture, the plaintiff was not manufacturing shell bodies, which were at the completion of its work parts of shells.

It should be borne in mind, however, that the tax is laid, not as a tax upon the shell, or any part of the shell, but is laid as an excise tax upon the business or occupation of manufacturing shells, or any parts of shells, the amount of the tax to be measured by the entire net profits received from the sale of such articles manufactured in the conduct of that business or occupation. That was the construction put upon section 27 of the War Revenue Act of 1898 (Act June 13, 1898, c. 448, 30 Stat. 464), imposing a tax upon persons carrying on the business of refining sugar equivalent to one-fourth of 1 per cent. on the gross amount of their receipts in excess of $250,000, in the case of Spreckle Sugar Refining Co. v. McClain, 192 U. S. 397, at page 411, 24 Sup. Ct. 376, 48 L. Ed. 496. As the tax is laid upon the business or occupation of manufacturing, the inquiry therefore is whether "any person manufacturing" includes only such persons manufacturing as bring the article manufactured to the finished condition, where it is adapted for use as a part of a shell, or whether the term includes any person manufacturing the article in any one or more of the successive steps substantially necessary to bring it to that condition.

If the former construction is to prevail, at which of the steps does the manufacture begin? If it is held that it does not begin until the manufacturer who brings it to its finished state commences his work, it would follow that, if the process of manufacture were distributed among a number of manufacturers, each doing a part of the manufacturing, the payment of the tax would be confined to that manufacturer who contributed such final steps as would bring the article to its completed state of adaptability to the purpose intended. I do not think the language of the section justifies an interpretation which would lead to nullifying its purpose, or would lead to a different measure of liability for the tax assessed against different manufacturers, or against the same manufacturer of different lots of shells, de-

pendent upon what part of the prior stages of manufacture might be done under contract or otherwise by others.

I think the language of the act is broad enough to clearly show that Congress intended to impose an excise tax upon the occupation or business of manufacturing in all or any of its stages, from the first step to the last of the manufacture which produces the shell, or any part of it, from the raw material composing it to its completed state, but that manufacturing must be held to have begun only when the material as such had been so changed by manufacture as to exhibit its intended use in, and application exclusively to, the manufacture of the final product.

In the present case ore was material for making pig iron, pig iron for making open hearth steel ingots, ingots for making blooms or rounds, and blooms or rounds for making billets, and the billets continued to be material, so far as manufacturing shell bodies was concerned, while in the form of billets. Each of these steps was a manufacturing one, but the manufactured article had not yet been adapted and applied to its final use for a shell body.

It is true that, under the Midvale Steel Company's contract, the specifications of which were to be adhered to by the plaintiff, the chemical composition of the steel was prescribed, and it was subject to the inspection of the representatives of the French government. There is nothing in the case, however, to show that the ingots, the blooms or rounds, or the billets were not of such composition as to be used generally in the trade for other purposes. When, however, in the next step the heated billet was forged by the piercing process, it became a hollow forging, closed at its base and open at its top, and destined to become a shell body. There was further progress towards that destination in the next stop of manufacture, when the pierced forging was drawn into a shell forging. The article then manufactured was peculiarly adapted and exclusively intended by further manufacture to become a shell body, and had no other use to which it was peculiarly adapted.

It is true there was evidence to show that such of the forgings as were rejected were sold by the plaintiff and other manufacturers to be used for other purposes. The plaintiff sold some to the Cameron Machine Company, which built machines for slitting paper and fabric from wide weaves into narrow strips. In its manufactured machines it uses a steel cylinder, against which a cutter runs, and it purchased the rejected steel forgings by the ton at scrap steel prices, cut them into cross-sections, making rings ranging from 8 inches to 14 inches in breadth, and machined them inside and out, to adapt them to the purposes of its machines. Sales of the rejected forgings at scrap prices were also made to the Larkin Packer Company, of Oklahoma, the closed ends cut off, and the forgings manufactured into drive shoes for oil well casings and couplings for castings. There was also evidence tending to show that the forgings might be converted into gas containers, but no evidence of actual sales or use for that purpose.

It appeared, however, in the use for cylinders for cutting machines, and the use for drive shoes and couplings for oil well casings, the features which adapted the forgings to those purposes were the qualities of the steel and the hollow cylindrical form of the shell forgings, which permitted them to be cut into suitable lengths, but that one essential feature of the forgings, the closed end, was entirely superfluous to the purpose for which the purchasers used the forgings. It is apparent, therefore, that the use to which the rejected forgings were put was one to which they could be fitted, but to which as a whole they were not peculiarly adapted in their manufactured state, and it is apparent that they were not sold by the ton as scrap metal at a profit as a manufactured article. With the piercing process, then, commenced the application of what had been a steel billet to the special use and purpose of producing a shell body. The plaintiff then became engaged in manufacturing shell bodies, and, when its part in the manufacturing was completed, it sold to the Midvale Steel Company partially manufactured shell bodies.

In view of the purpose of Congress to tax the business of manufacturing, and to include within the scope of such business all manufacturing regardless of whether the manufacturer was engaged in carrying the manufacture to completion or through some of its stages, the profits received "from the sale or disposition of such articles manufactured" is held to include profits from the sale or disposition of those partially, as well as those completely, manufactured. If the tax were laid upon the manufactured article as it is, for example, under title IV, chapter Eight F, section 6309¾a et seq., Compiled Statutes 1918, Compact Edition, or were laid upon an article as customs duties are charged upon commodities upon their being imported into the United States, the conclusion would no doubt be, as contended for the plaintiff, that only the manufacturer selling the finished article would be liable for the tax.

That rule has been settled beyond dispute by the multitude of decisions cited on behalf of the plaintiff, where the courts have ruled that a manufactured article does not become such until its manufacture is complete; that is, it must be so changed from the material of which it is composed by the application of labor, skill, and science as to be put into a form that is suitable for use and adapted with a design to be used as such article. The rule has been applied in the classification of articles of merchandise imported and subject to customs duties, or upon which drawback is allowed. There are decisions as to what constitutes a manufactured article, what constitutes a part of a manufactured article, what constitutes a partially manufactured article, what constitutes a manufacture of certain material, and what constitutes a wholly manufactured article, dependent upon the terms of the law under which a tax is laid upon the article itself, or under which a drawback or other privilege is allowed.

I cannot perceive that these cases have any bearing upon the question arising in this case, unless the terms of the act imply that the tax is to be imposed only upon the business of manufacturing to comple-

tion shells, or parts of shells, and there is no such limitation in its terms. The clear purpose of the act is, through taxation of the business or occupation of manufacturing munitions of war, to reach the profits of all those engaged in such manufacture, whether engaged in manufacturing to completion, or engaged in any part of such manufacturing.

The plaintiff was, therefore, a person within the terms of the act manufacturing parts of shells, and was liable to payment of the tax.

It is with some reluctance that the conclusions herein set forth have been reached, in view of the contrary ruling of Judge Thomson, of the Western District, in his charge to the jury in a recent case. However, after very careful consideration of the questions involved, and with due deference to the opinion of so learned and careful a judge, I am forced to the opposite conclusion.

### Rulings on Plaintiff's Requests for Findings of Fact.

1. The several facts in detail contained in the stipulation of agreed upon facts.

This stipulation is filed of record, and it is so found.

2. That the forgings manufactured by the plaintiff, at the stage of their development when delivered to the Midvale Steel Company by the plaintiff, were marketable otherwise than for finishing as shells, and, as matter of fact, large numbers of rejected forgings were sold by the plaintiff to the Larkin Packer Company, of Oklahoma, for development by the latter into shoes for gas wells; and these forgings were also marketable for use in the manufacture of slitting and rebinding machines, and many of a similar fabrication were actually bought by the Cameron Machine Company, of Brooklyn, from other manufacturers, and effectively used in the manufacture by said company of such slitting and rebinding machines.

It is so found, in connection with findings heretofore stated and discussed.

3. The processes through which the material went after leaving the plaintiff's hands, before being finished for practical use, were 29 in number.

It is so found, in connection with the findings heretofore stated and discussed.

### Rulings on Plaintiff's Requests for Conclusions of Law.

1. That the forgings, the net profits from the manufacture of which are involved in this suit, were not any of the articles, or parts of the articles, made taxable by section 301 of title III of the act of Congress of September 8, 1916, commonly known as the Munitions Manufacturers Tax Act.

This request is declined.

2. That the plaintiff is entitled to a finding that there is due from the defendant to it the amount of its claim, $74,857.07, with interest from July 25, 1917. See, on the question of interest, Klock Produce Co. v. Hartson, Collector (D. C.) 212 Fed. 758; State Line & S. R.

Co. v. Davis (D. C.) 228 Fed. 246; Home v. Parrish, 229 U. S. 494, 497, 33 Sup. Ct. 944, 57 L. Ed. 1296.

This request is declined.

### Rulings on Defendant's Requests for Finding of Fact.

1. During the taxable year 1916 the Midvale Steel Company was under contract to sell and deliver to the French government 394,000 high explosive shells of four different sizes, to be manufactured according to specifications, which were made a part of the contract.

It is so found.

2. The product thus contracted for consisted of two pieces: (1) A shell forged or drawn from steel and finished by the necessary machining and finishing processes; and (2) a copper band fitted around the shell, for the purpose of guiding it through the rifling of the gun. But the Midvale Steel Company did not undertake to furnish the fuses and explosives which were to be thereafter put in the shells. In other words the contract called for unloaded shells.

It is so found.

3. It was provided by the contract that the French government should "have the right of having one or more inspectors at each of the factories where the shells hereby contracted for and their component parts are being manufactured, for the purpose of observing the manufacture thereof and of testing the same at any time before delivery."

It is so found.

4. The specifications made a part of the contract include specifications as to the composition and manufacture of the steel to be used, the forging or drawing of the shell from the steel, the machining and finishing of the shell, and the making and fitting of the copper band.

It is so found.

5. In the manufacture of some of the shells the Midvale Steel Company did all the work, beginning with the manufacture of the steel. But as to others it contracted with the plaintiff to furnish the material, manufacture the steel, and forge and draw the shells. This was done according to the specifications above referred to and under inspection of the French government. When the shells were thus forged and drawn, they were delivered by the plaintiff to the Midvale Steel Company, and that company did all necessary machining and finishing on them, and fitted the copper bands around them, and thus further proceeded with and completed the manufacture of the product contracted for.

It is so found.

6. The actual cost of the work done by plaintiff was about 40 per cent. of the cost of all the work done on the shells, and the cost of the work done by the Midvale Steel Company was about 60 per cent.

It is so found.

7. The plaintiff's profit, during the taxable year 1916, on the materials furnished and the work done by it as aforesaid, was $598,856.52.

It is so found.

8. The unloaded shell delivered by the Midvale Steel Company to the French government was the forged or drawn shell delivered to the former by the plaintiff after being subjected to the necessary machining and finishing processes and having a copper band fitted around it.

It is so found.

9. In order to make these forgings, the plaintiff had to provide special machinery at a cost of about $2,000,000.

It is so found.

10. The forgings themselves, as delivered by the plaintiff, were specially designed and manufactured to be, when properly machined and finished, used as parts of completed shells. They were not adapted for any other practical use, and were not such articles or commodities as are kept in stock and held for sale commercially.

It is so found.

11. During the year 1916 there were a great many companies in the United States engaged in doing some part of the work necessary to the manufacture of shells, but not more than two or three, if that many, which began with the steel and did all the work necessary to complete the shell.

It is so found.

12. The plaintiff and the Midvale Steel Company are both owned and controlled by the Midvale Steel & Ordnance Company, a holding corporation.

It is so found.

Rulings on Defendant's Requests for Conclusions of Law.

1. The plaintiff was a person manufacturing explosive shells, or part of such shells, and the tax paid, and now sought to be recovered, was properly collected.

It is so found.

2. The plaintiff was a person manufacturing parts of shells, and the tax paid, and now sought to be recovered, was properly collected.

It is so found.

3. The plaintiff was a person manufacturing shells, and the tax paid and now sought to be recovered, was properly collected.

Under the undisputed facts in this case, this finding is immaterial, and is denied, except as to the conclusion that the tax paid, and now sought to be recovered, was properly collected.

Judgment may be entered for the defendant.