STUTTGART RICE MILL COMPANY *v.* CRANDALL.

4-6612                                   157 S. W. 2d 205

Opinion delivered December 8, 1941.

*Joseph Morrison,* for appellant.

*A. G. Meehan* and *John W. Moncrief,* for appellee.

*John L. Ingram; Rose, Loughborough, Dobyns & House; St. Clair Adams & Son; Wallace & Martin* and *R. J. Putman, amici curiae.*

GRIFFIN SMITH, C. J. The appeal questions constitutionality of Act 29, approved February 6, 1941, designated by the general assembly as Rice Development Commission Law. It authorizes the governor to appoint five commissioners, not less than three of whom *shall* be rice growers, and two of whom *may* be rice millers.[1]

A tax of two cents per hundred pounds on rice milled within the state is levied, effective after August 1, 1941; contingent, however, upon adoption by Texas of a similar statute.

The plan is borrowed from a Louisiana act, approved July 10, 1940. Texas enacted a measure at variance with those of Louisiana and Arkansas, its effective date being October 2, 1941.

---

[1] The implication arising from use of the words "shall" and "may" seems to be that all of the commissioners may be rice growers.

At the time the lawmaking body of Arkansas was considering the bill which became Act 29, the general assembly of Texas was debating an identical scheme. The attorney general's opinion was requested. Because that official thought the measure violative of the Texas constitution, changes were made; and an act materially different from the original resulted.

By agreement the transcript in the instant case was amended to include as defendants certain mills and the Arkansas Rice Growers Cooperative Association.[2] An agreed statement is that more than 90 per cent. of rice grown and milled in Arkansas is sold for shipment to points in other states and in foreign countries. The tax sought to be levied will produce $65,000 annually.

Among other objects Act 29 seeks to accomplish, that of ". . . promoting the prosperity and welfare of rice growers and producers . . . through . . . publicity, sales promotion, and development campaigns" is paramount and is mentioned as second only to the intent ". . . to encourage, increase, and stimulate the use and sale of rice."

Under a sub-title, "Creation, Collection, and Use of Fund," methods of administration are set out. They appear as § 4, shown in the margin.[3]

Section 5 provides that the tax shall be paid by all rice millers, remittances to be made within the first ten days of each month for all rice milled during the preceding calendar month, ". . . which tax shall be re-

[2] The Arkansas Rice Growers Cooperative Association; Walton Rice Mill, Inc.; Standard Rice Company, Inc.; Arkansas State Rice Milling Company; Smith Rice Mill Company; Mouton Rice Milling Company.

[3] "There is hereby assessed a tax of two cents per hundred pounds on all milled rice which is milled in the State of Arkansas on and after the first day of August after the Legislature of Louisiana and Texas shall have adopted a statute similar to this statute, assessing a tax of not less than two cents per hundred pounds on milled rice in said states and creating similar commissions, boards, departments or other authorities in said states having similar powers and purposes, or vesting such powers and purposes in officers, commissions, boards, departments or other authorities already created in such states."

mitted direct to the rice development commission.''
Penalties are provided for failure to report and make
payments, and for refusal of millers to allow their books
to be examined; also for failure to keep the necessary
records. The fine is fixed at not more than $500,
''. . . or imprisonment for more than six months, or
both, together with the cost of prosecution.'' [4]

Although the commissioners serve without pay, they
are authorized to select a manager and all other persons
necessary to administer the law, ''. . . in connection
with the Louisiana and Texas commissions, . . .
which manager and other persons shall receive such sal-
ary or compensation as the commission may fix, plus
such expenses as they may actually incur.'' [5]

Of the numerous objections urged against validity
of the Act, we shall consider but two: (a) that the tax
is levied for a private purpose; (b) that milling rice is
an occupation, and cannot be taxed for state purposes.
Since both objections must be resolved in favor of the
appellants, other matters are unimportant.

Courts of three states have approved legislation
thought by appellees to be similar in principle to Act 29.
A tax imposed on packages or crates of oranges, grape
fruit or tangerines grown in Florida was upheld in *Floyd
Fruit Co.* v. *Florida Citrus Fruit Commission,* 128 Fla.
565, 175 So. 248, 112 A. L. R. 562. Apples, prunes, pota-
toes, and onions were classified in an Idaho statute on
which a tax was laid for benefit of the industry. *State
ex rel. Graham* v. *Enking,* 59 Idaho 325, 82 Pac. 2d 649.
A tax on apples to be paid by the growers when shipped,
proceeds of the tax to be used for advertising Michigan
apples, was upheld in *Miller, et al.,* v. *Michigan State
Apple Commission, et al.,* 296 Mich. 248, 296 N. W. 245.
In the Michigan case two judges recorded dissents.

---

[4] It was probably the intention of those who drafted the bill to
make the jail sentence *not* more than six months. An examination of
the original document, however, discloses that the word "not" has
been omitted.

[5] But see art. 5, § 29, and art. 16, § 4, of the constitution. Com-
pare with *Nixon* v. *Allen,* 150 Ark. 244, 234 S. W. 45; *Ward* v. *Bailey,
Governor,* 198 Ark. 27, 127 S. W. 2d 272.

In *Cobb* v. *Parnell,* 183 Ark. 429, 36 S. W. 2d 388, a property tax levy of half a mill annually for payment of bonds issued by agricultural credit corporation was upheld on the theory that an emergency existed and that the purpose to be served was public. The opinion states that plight of the people was the motive moving the general assembly when the tax was levied, and ". . . relief of a people wholly destitute and utterly helpless" was the aim in mind. It was then said by Mr. Justice BUTLER ". . . a review of [court decisions] heretofore cited [where there were constitutional provisions similar to ours, shows that] aid has been extended by the state under varying circumstances, to ward off anticipated dangers, or relieve present calamities; and, even in those cases denying the authority of the state to lend its aid, the intimation is that statutory relief was denied not so much for lack of power, but rather that the power was improvidently exercised and without sufficient reason."

The holding in *Smith* v. *Arkansas Irrigation Company,* 200 Ark. 1022, 142 S. W. 2d 509, was that where an entire community is engaged in rice farming and subterranean sources of water have been drained to such an extent that the cost of pumping is exorbitant, and there is danger of further depletion of the underground supply, a determination by the legislature that the impounding of surface water for irrigation purposes was essential to the public welfare would not be disturbed on an allegation that exercise of the right of eminent domain expressly conferred by the general assembly was in conflict with the constitution.

The Irrigation Company case has no applicability here other than to emphasize the court's view that where the thing it is sought to do is one of general necessity, there exists a community of interest which warrants the taking of private property for the public good. That right, however, is derived from the constitution; and, as Chief Justice COCKRILL said in *St. Louis, I. M. & So. Ry. Co.* v. *Petty,* 57 Ark. 359, 21 S. W. 884, 20 L. R. A. 434, "When once the character of the use [of property sought

to be condemned] is found to be public, the court's inquiry ends, and the legislative policy is left supreme. . . ."

Interesting discussions of the nature of tax levies are found in *Sims* v. *Ahrens,* 167 Ark. 557, 271 S. W. 720. Four opinions were written; the original majority by Mr. Justice FRANK G. SMITH; a concurrence by Mr. Justice HART (later Chief Justice), in which Mr. Justice HUMPHREYS joined; an opinion on rehearing by Mr. Justice WOOD, in which he agreed with the views previously expressed by Mr. Justice HART and Mr. Justice HUMPHREYS; and finally, a dissenting opinion by Mr. Justice FRANK G. SMITH, concurred in by Chief Justice McCULLOCH.

In the dissenting opinion, after referring to authorities cited in support of the proposition that there was no authority for imposition of an income tax, it was said: ". . . the reason given in all those cases, for holding that counties and cities may tax occupations, but that the state could not do so for state purposes, was that the right had not been denied in the one case, while it had been in the other. It would appear that if the state may tax incomes for state purposes, it may also tax occupations. No sound distinction can be drawn between the right to tax the one, rather than the other. The right to tax both exists unless the constitution has withheld that right."

Of the income tax, Mr. Justice WOOD, in the opinion on rehearing, said: "Now, of the various forms and kinds of excise taxes, a tax on incomes holds its own place; it falls in its own particular and distinctive class, and must not be confused with occupation, license, franchise, and business taxes." Mr. Justice WOOD held the further view that the right to engage in an employment or profession, or to carry on a business not in itself hurtful and not pursued in a manner harmful to the public, is a common right, ". . . which, under our constitution, as construed by all our former decisions, *can neither be prohibited nor hampered by laying a tax for state revenue on the occupation, employment, business, or profession."* The learned Justice then explained

what to his mind distinguished the occupation, business, or profession, as such, from the income derived from it.

The original majority opinion was that ". . . this court cannot consistently hold that it is within the power of the legislature to declare and tax as privileges, for state revenue, pursuits and occupations which are matters of common right."

Mr. Justice HART, in his concurring opinion, said: "Our conclusion of the whole matter is that the effect of our previous decisions that the proviso in art. 16, § 5 of the constitution, giving the legislature the power to tax certain occupations, by necessary implication precludes it from taxing other occupations for state purposes and that, if the provision had been left out of the section, the legislature might have taxed all occupations." [6]

In spite of divergent views regarding the nature of an income tax, all of the judges agreed there was no power to tax occupations for state purposes (other than those enumerated in art. 16, § 5 of the constitution) and no decision since has been to the contrary.

By express terms of Act 29 a tax of two cents per hundred pounds is assessed on all rice milled in Arkansas. Necessarily the miller must pay the tax. There is no provision in the law for regulation of mills. No inspection is contemplated other than an examination of records to determine what the tax should be. The miller derives no direct return from the tax, receives no consideration for the payment. The charge is made for using the property in the only way it can be utilized—the milling of rice; hence, the tax is laid on a common right, and is prohibited by the constitution.

[6] See *Baker* v. *State*, 44 Ark. 134; *Sparling* v. *Refunding Board*, 189 Ark. 189, 71 S. W. 2d 182; *Floyd* v. *Miller Lumber Co.*, 160 Ark. 17, 254 S. W. 450, 32 A. L. R. 811; *Wiseman* v. *Phillips*, 191 Ark. 63, 84 S. W. 2d 91; Cooley on Taxation, Fourth Edition, § 1673; *American Manufacturing Co.* v. *City of St. Louis*, 250 U. S. 459, 63 L. Ed. 1084, 39 Sup. Ct. Rep. 493; *Spreckels Sugar Refining Co.* v. *McClain*, 192 U. S. 397, 48 L. Ed. 496, 24 Sup. Ct. Rep. 376; *Oliver Iron Mining Co.* v. *Lord et al.*, 262 U. S. 172, 67 L. Ed. 929, 43 Sup. Ct. Rep. 526; *Worth Bros.* v. *Lederer, Collector*, 256 Fed. 116; *Viquesney* v. *Kansas City et al.*, 305 Mo. 488, 266 S. W. 700; *Gila Meat Co.* v. *State*, 35 Ariz. 134, 276 Pac. 1; *City of Cincinnati* v. *Cincinnati Oil Works Co.*, 123 O. S. 448, 175 N. E. 699.

Nor is the situation altered by the fact that rice is a food, and that in its culture, harvesting, milling, classification, storage, branding and shipment care must be exercised to prevent it from reaching the public in an impaired condition. Authority to inspect has existed for more than fifteen years. See Act 218, approved March 25, 1925. Section 3 of Act 218 empowers the state plant board ". . . to fix and promulgate official standards for grading and classifying any or all agricultural products grown or produced in this state and to fix and promulgate official standards for containers of farm products."

Broad use may be made of the state's police power; and if the treatment of rice by grower, miller, seller, or others dealing with it creates a hazard against which there should be protection, then, admittedly, any agency through which it passes may be subjected to regulation and a tax laid for the reasonable cost. But, like corn, wheat, and all agricultural commodities of common use, rice is extremely wholesome. It contains no quality or element requiring that strict supervision which must be applied to products inherently harmful.

The latest federal census of agriculture for Arkansas lists 1,428 rice farms, embracing 153,095 acres. The total of *all* farms in the state is 216,671, the acreage being 6,609,833. In point of numbers, rice farms account for .0066 per cent. of the total, and in acreage, .023 per cent.

Can it be said that the interests of so small a group (although such farmers are among the more aggressive, progressive, and substantial of the state) are such as to call for protective intervention by the state's taxing powers on the theory that the common welfare is involved? That which is termed the logic of this contention is shredded by the facts.

But, it is insisted, the commission ". . . may be treated and considered, if necessary, as a division or department of the bureau of mines, manufacture and agriculture."[7] Here, again, realities intervene; for Act 29 in very positive language undertakes to create an

[7] Section 1, art. 10, constitution.

agency independent of all others save similar commissions in Texas and Louisiana. Even if this construction should be given, and the commission should be classified as a part of the bureau of mining, manufacturing and agriculture,[8] authority for taxing millers of rice for advertising purposes would still be lacking. While the general assembly would have power to make necessary appropriations from available funds for administration of the duties thus imposed, rice mills could not be singled out and assessed with cost of the bureau's activities.

It would be just as logical to say that all gins must pay a tax for the privilege of ginning cotton; that oil mills and compresses may be assessed for purposes of tri-state publicity; that a blacksmith may not use his anvils or shoe a horse without yielding to the taxing authority a percentage of his income; that every garage in Arkansas may be taxed by the state for the privilege of repairing automobiles, and that other domestic industries, *ad infinitum*, may be brought within the tax structure on a concept hereofore held to be prohibited by the constitution.

It is argued that the exaction is insignificant. If a tax of two cents per hundred pounds produces $65,000 annually from the milling of rice grown on 1,428 farms, the cost would be the equivalent of $45.51 per farm, or 42.50 cents per acre. This, however, is not the test of validity. The questions are, Did the general assembly have power, under the constitution, to assess the tax?, and was it laid for a public purpose? There must be a negative answer to each question.

The decree is reversed with directions to enjoin enforcement of the act.

McHANEY, J. I regret that the majority have found it necessary to strike down Act 29 of the Acts of Arkansas for 1941, and with it an almost identical act of the

---

[8] The bureau of mines, manufacture and agriculture was abolished by Act 153, approved March 25, 1933. By Act 209, approved March 28, 1933, appropriations were made for certain functions formerly discharged by the bureau, for the years 1934 and 1935.

legislature of Louisiana enacted in 1940, and a similar act adopted by the Texas legislature in 1941, as they were expressly made interdependent in their effect and operation, and if one falls, all will fall.

The striking down of an act of the legislature by judicial construction is no light responsibility, even though it is not tied in with legislation of other states, but when, as here, such a construction takes with it the solemn legislative enactments of other states, the responsibility is greatly increased, and I am unwilling to assume it. As we said in *Bush* v. *Martineau,* 174 Ark. 214, 295 S. W. 9, which I deem quite pertinent here: ''Before proceeding to a discussion of the issues raised by this appeal, we deem it proper to premise our remarks by two fundamental rules of construction announced and adhered to throughout the history of this court. First, that the Constitution of this state is not a grant of enumerated powers to the legislature, not an enabling, but a restraining act (*Straub* v. *Gordon,* 27 Ark. 625), and that the legislature may rightfully exercise its powers subject only to the limitations and restrictions of the Constitution of the United States and of the State of Arkansas. *St. L., I. M. & S. Ry. Co.* v. *State,* 99 Ark. 1, 136 S. W. 938; *Vace* v. *Austell,* 45 Ark. 400; *Carson* v. *St. Francis Levee Dist.,* 59 Ark. 513, 27 S. W. 590; *Butler* v. *Board, etc.,* 99 Ark. 100, 137 S. W. 251. In other words, as was said in *McClure* v. *Topf & Wright,* 112 Ark. 342, 166 S. W. 174: 'It is not to be doubted that the legislature has the power to make the written laws of the state, unless it is expressly, or by necessary implication, prohibited from so doing by the Constitution, and the act assailed must be plainly at variance with the Constitution before the court will so declare it.' Second, that an act of the legislature is presumed to be constitutional and will not be held by the courts to be unconstitutional unless there is a clear incompatibility between the act and the Constitution; and further, that all doubt on the question must be resolved in favor of the act. *State* v. *Ashley,* 1 Ark. 513; *Eason* v. *State,* 11 Ark. 481; *Dabbs* v. *State,* 39 Ark. 353, 43 Am. Rep. 275; *Sallee* v. *Dalton,* 138 Ark. 549, 213 S. W. 762; and in *Standard Oil Co. of La.* v. *Brodie,* 153 Ark. 114,

239 S. W. 753, this court quoted the language of the Supreme Court of the U. S. in *Hooper* v. *People of California,* 155 U. S. 648, 15 S. Ct. 207, 39 L. ed. 297, that 'the elementary rule is that every reasonable construction must be resorted to in order to save the statute from unconstitutionality.' There are a great many decisions of this court announcing and following these rules under a great variety of circumstances, and we do not therefore cite or quote from more of them.''

Act 29 of 1941 is somewhat novel, but its legislative purpose is not entirely new and without precedent, and such acts have been sustained by the courts of many states and the Supreme Court of the United States. For instance, about 20 years ago, the Kentucky Court of Appeals, in *Hendrickson* v. *Taylor County Farm Bureau,* held that an act of the legislature of that state, ''providing for the organization of county farm bureaus to advance agriculture, home economics, horticulture and animal industry, in co-operation with the State College of Agriculture and with the United States Department of Agriculture, and providing for appropriation by the county fiscal court of a sum double the amount of dues collected, not exceeding a certain amount,'' did not violate § 3 of the Constitution, providing that ''no grant of exclusive, separate public emoluments or privileges shall be made to any man or set of men, except in consideration of public services.'' Nor did it violate § 171, providing: ''Taxes shall be levied and collected for public purposes only,'' nor was it in violation of § 181.

In *C. V. Floyd Fruit Co. et al.* v. *Florida Citrus Commission,* 128 Fla. 565, 175 So. 248, the Supreme Court of Florida sustained an act of the legislature of that state, levying a tax on each standard-packed box of oranges, grapefruit or tangerines grown in the state to be collected and used in advertising said fruits. It was there held that such a tax is an ''excise tax'' and not a ''property tax,'' and does not violate constitutional rules of equality, uniformity, or due process, as provided in the Constitutions of Florida or the United States; that such an excise tax is not unreasonable, unjustly discriminatory, nor arbitrary; that the tax was levied on the privilege of turning

said fruits into the channels of trade, and is a valid tax regardless of whether they were later to be shipped in interstate or foreign commerce; and that the tax so imposed was for the purpose of advertising such citrus fruits and was for a public purpose and valid because the promotion of the citrus industry in Florida is a matter of public concern.

In *State ex rel. Graham* v. *Enking,* 59 Idaho 321, 82 Pac. 2d 649, decided August 30, 1938, the Supreme Court of Idaho had under consideration a statute of that state, levying a tax of one cent on each 100-pound unit of apples, prunes, potatoes and onions shipped within the state, for the purpose of providing a fund for advertising such fruits and vegetables. It was there held against the several contentions of invalidity that it was a tax on the privilege of turning such fruits and vegetables into the primary channels of trade and was not a tax on such fruits and vegetables; and that it is an "excise tax" and not a "property tax" and did not, therefore, violate constitutional rules of equality, uniformity or due process. It was there further held, in line with our own decisions above cited and many others, to quote a headnote, that: "Where a statute has two possible interpretations one of which would render it unconstitutional and the other valid, court is under the duty to adopt the valid interpretation, and this rule applies where its application will avoid any serious doubt."

In *Miller et al.* v. *Michigan State Apple Commission et al.,* 296 Mich. 248, 296 N. W. 245, decided February 7, 1941, the Supreme Court of Michigan had under consideration a statute of that state, Act 87 of the Acts of 1939, known as the "Baldwin Apple Act," which levied "an assessment of 1 cent per bushel, or 2 cents per 100 pounds of all apples grown and produced in Michigan, payable by the grower or grower's agent when shipped, with certain exceptions, and providing that "all moneys levied and collected under this act shall be expended exclusively to advertise apples." The act was sustained as a valid and constitutional exercise of legislative power, as not being discriminatory, not a tax on property, but

on the privilege of putting apples in the marts of trade, and is one for a public purpose.

So, if Florida can levy a valid tax on her citrus fruits; if Idaho can on her apples, prunes, potatoes and onions; and if Michigan can on her apples, it is difficult to perceive why Arkansas cannot on her rice. The growing and milling of rice in Arkansas is one of her major industries, involving wealth running into the millions of dollars. As I understand it, the majority have held said Act 29 void because it is a tax on property, or that it is a tax on the privilege of milling rice which is an occupation of right and cannot be taxed. This is the mere *ipse dixit* of this court. I think it is a privilege or excise tax, not upon the milling of rice, but upon the privilege of putting milled rice in the channels of commerce. The act does not say so in so many words, as do some of the acts in cases above cited, but its omission does not keep it from being so, just as its declaration in said other acts does not make it so, if, in fact, it were not.

Milled rice is an important article of food for human consumption, and the tax might well be sustained as one within the police power of the state as it has a direct relation to the public health. It is a well known fact that in the milling of rice, when the inner coating or polish of the berry is removed, the rice or health germ is also removed. It is also a well known scientific fact that a diet composed exclusively of white rice produces or causes a deadly disease known as beriberi. See Webster's Dictionary and an article in the Saturday Evening Post of November 1, 1941, entitled "Morale in a Test Tube." The purpose of this act, in addition to the advertising of our rice, is to provide a fund for laboratory experimentation to develop or improve the methods of milling, how to preserve and retain the health germ and to develop a method of preserving brown or unpolished rice, and for various other purposes.

Appellants have raised and argued many other questions touching the validity of said act, which I do not understand the majority opinion discusses. Some of them are: that the act is an illegal compact between the

states involved; that the Texas act is not similar; that the Texas act did not become effective until 90 days after the adjournment of the Texas legislature and that, therefore, the tax for 1941 could not be collected; and. others, all of which I have carefully considered and do not find them to have substantial merit.

I, therefore, register my dissent, and am authorized to say that Mr. Justice HUMPHREYS agrees with the views herein expressed.