McGriff v. State.

4459                                             204 S. W. 2d 885

Opinion delivered October 20, 1947.

*Walter H. Laney, Jr.,* and *Robert C. Hunt,* for appellant.

*Guy E. Williams,* Attorney General, *Oscar E. Ellis,* Assistant Attorney General, and *Fletcher Long,* for appellee.

GRIFFIN SMITH, Chief Justice. The appeal is an attack upon constitutionality of Act 186 of 1935 as amended by Act 220 of 1945. The enactment of 1935 was held to be good when attacked by Jack Gray and T. G. Allen upon the grounds (a) that it reached nonresidents only and was therefore repugnant to § 18 of art. 2 of our Constitution; (b) that it offended the Fourteenth Amendment to the Federal Constitution, and (c) that it was a burden upon interstate commerce. *State* v. *Gray et al.*, 192 Ark. 1045, 96 S. W. 2d 447. The opinion does not show the Act was questioned on the ground that it imposes a prohibitive tax under the guise of regulation and then omits regulation. Sections 1 and 2 of Act 186 were discussed in the *Gray* opinion.

In November 1946 C. V. McGriff was arrested in Forrest City. The charge was that as traveling salesman for Olan Mills Portrait Studios he had not paid the taxes levied by Acts 186 and 220. Upon conviction he was fined $25.

It is stipulated that Olan Mills as a partnership does business in approximately twenty states. The home office is at Chattanooga, Tenn. Studios in Arkansas are at Pine Bluff and Little Rock. Business has been conducted at Pine Bluff since 1939. Operations extend to all counties of the State. The partnership has paid all taxes levied by the State, including sales tax, unemployment compensation, and in addition has complied with municipal requirements. The only complaint is that there is refusal to meet exactions of Acts 186 and 220. The stipulation contains this sentence: "The reliability and good faith of the firm in the conduct of its business [are] not questioned."

The following is copied from the agreement:

"In the light of experience of Olan Mills Studios, reasonable estimates of the results of the Company's sending one of its sales crews into an Arkansas town the size of Forrest City [would be]: Gross receipts, including sales of extra prints, frames, etc., $2,000. Costs [incident to realization of the gross receipts would be: (a)

advance selling, 20% or $400; (b) photographer and showing proofs, 25% or $500; (c) supervision, 7% or $140; (d) total spent in Arkansas, 52% or $960; (e) administrative expense, including city licenses, 10% of sales and other taxes, but *excluding* the taxes laid by Act 186 as amended by Act 220, $200; (f) manufacturing expense, 36% or $720; (g) net profit, $40. Taking into consideration all areas in which the Company operates in the United States, its average net profit on operations in a town or city is five percent of the gross receipts. This figure has not yet been attained in Arkansas.''

It is first contended by appellants that the tax is an unreasonable burden on interstate commerce. The facts show that ''in addition to the permanent studios'' traveling road crews or sales units are employed. For example it is said that in a town such as Forrest City there would be an advance force consisting of from two to five salesmen who would canvass for customers ''soliciting orders for appointments for pictures.'' In a city of six thousand population the time required for solicitation is from two to three days. The salesmen are followed by a photographer who establishes temporary headquarters—usually at a hotel. At the appointed time the photograph is ''taken.'' Negatives are then sent by express . . . to one of the Company's three finishing plants. All negatives from Arkansas . . . are sent to Chattanooga. There they are developed and the proofs are printed. By appointment made by mail proofs are shown to the customer by another representative and the customer places his order for future delivery. The proofs with the order are sent by mail to the finishing plant at Chattanooga. The order is for delivery from Chattanooga, and ''no part of the processing, finishing, or manufacturing is performed in Arkansas.''

Although negatives were completed and prints sent by mail, it is stipulated that the Company maintains three finishing plants; and, while ''all negatives from Arkansas are sent to Chattanooga,'' it is not disclosed whether negatives from other states are sent to Pine Bluff or Little Rock; hence it is inferable that domestic finishing

plants are operated. At least the possibility is not excluded; nor is it shown that collection for pictures sent from Chattanooga is not made by the Little Rock or Pine Bluff offices. With the record in this condition we are not willing to rest the decision upon interstate commerce.

The two Acts declare that "the vocation, occupation or business of going into and about the city or county soliciting orders through the sale of coupons, or otherwise, for portrait photographic work, enlargements and tinted portraits in water colors or in oils, by nonresident photographers not having a permanently established place of business within this State" is a privilege, and taxable as such. The *Gray* case seemingly holds that a citizen of one county is a nonresident in his relations to the citizens of another county, and the Act of 1935 was thought to establish a proper classification within the meaning of Sec. 18 of art. 2 of our constitution; and, while there is not an express finding that photography is not a matter of right, there is the comment that the statute's exception saves from the tax "those only . . . who have a permanently established business of one year's duration immediately prior to the application *for the privilege of doing such business.*"

Treating this expression as judicial assent to the legislative determination that the operation is a privilege, we must deal with it as such. But see *Stuttgart Rice Mill Co.* v. *Crandall*, 203 Ark. 281, 157 S. W. 2d 205.

The exactions laid by legislative enactment, and resulting in appellant's conviction for refusing to pay, are not a tax on property. Privileges, as such, may be taxed by the State. Article 16, Sec. 5, Constitution of 1874. As was said by Chief Justice McCulloch in *Ex Parte Byles,* 93 Ark. 612, 126 S. W. 94, 37 L. R. A., N. S. 774,[1] we need not stop to consider whether the statute imposes a tax for revenue purposes or is merely a police regulation, for the Legislature can exercise either power. If the statute be found free from objection on the charge of unjust classification, it can be justified either as a police

---

[1] Writ of error denied by U. S. Supreme Court, 225 U. S. 717, 32 S. Ct. 836, 56 L. Ed. 1270.

regulation or as a privilege tax imposed for the purpose of raising revenue.

Does the legislation, under the guise of a revenue measure, disclose a purpose to prohibit rather than to control?

A rule frequently emphasized is that when a legislative body having power to tax a certain subject matter actually imposes such a burdensome assessment as effectually to destroy the right to perform the act or use the property, then validity of the enactment depends upon the nature and character of the thing or operation destroyed. If so great an abuse of the taxing power is manifest as to render valueless natural and fundamental rights which no free government could consistently violate, it is the duty of the judiciary to hold such act unconstitutional. In any other case, however, since the taxing power conferred by the Constitution knows no limits except those expressly stated in that instrument, it must follow that if a tax is within the lawful power, the exertion of that power may not be judicially restrained because of the results to arise from its exercise. American Jurisprudence, v. 51, Taxation, p. 80, Sec. 49. The text is supported by *McCray* v. *United States,* 195 U. S. 27, 49 L. Ed. 78, 24 S. Ct. 769, 1 Ann. Cas. 561.

In *Spencer* v. *Merchant,* 125 U. S. 345, 8 S. Ct. 769, 31 L. Ed. 763, Mr. Justice GRAY said that the judicial department of government was without authority to prescribe to the legislative department limitations upon the exercise of an acknowledged power. Although the power to tax may be used oppressively, the responsibility of the legislature is not to the courts, but to the people by whom its members are elected. But, said Mr. Justice WHITE in the McCray opinion, if a case is presented where abuse of the taxing power is so great as [to show that the constitution did not intend that it be conferred], and where it is plain to the judicial mind that the power has been called into play not for revenue, but solely for the purpose of destroying rights which could not be rightfully destroyed consistently with the principles of freedom and justice upon which the Constitution rests,

it would then be the duty of courts to say that such an arbitrary act was not merely an abuse of delegated power, "but was the exercise of an authority not conferred."

It must be clear from the citations we have given that somewhere between the twilight zone of unlimited authority to tax, and the right to tax privileges either for revenue or to defray the cost of regulation, there is a limit beyond which legislative enactment may not go merely because it has power to mark the boundary of common rights upon the one hand and the control of a privilege upon the other. Conceding that the legislative power is unlimited in certain particulars, and that motives may not be challenged, nevertheless it does not imperatively follow that where the General Assembly has sought by the same enactment to produce revenue and to regulate, the person affected is without a remedy.

In *Conway* v. *Waddell*, 90 Ark. 127, 118 S. W. 398, the Court considered a municipal ordinance regulating street peddling and street exhibitions, and fixing a license fee. Mr. Justice Wood, speaking for the Court, said the tax was manifestly for the purpose of regulation *and* revenue, adding, "The fee and tax of $25 per day for the privilege of carrying on the business . . . renders the ordinance for such purposes void on its face."

In 1925 the Supreme Court of Michigan held that a statute requiring transient merchants to pay a license fee of $3,000 per year was palpably oppressive and void. *People* v. *Raivley*, 231 Mich. 374, 204 N. W. 137, 39 A. L. R. 1381. The opinion cites *Chaddock* v. *Day*, 75 Mich. 527, 4 L. R. A. 809, 13 Ann. St. Rep. 468, 42 N. W. 977, where it was said: "It is quite common in these latter days for certain classes of citizens—those engaged in this or that business—to appeal to the government— national, state, or municipal—to aid them by legislation against another class of citizens engaged in the same business, but in some other way. This class legislation, when indulged in, seldom benefits the general public, but nearly always aids the few for whose benefit it is enacted, not only at the expense of the

few against whom it is ostensibly directed, but also at the expense and to the detriment of the many, for whose benefit all legislation should be, in a republican form of government, framed and devised. This kind of legislation should receive no encouragement at the hands of the courts, and be only upheld when it is strictly within the legitimate power of Congress, or the state or municipal legislatures." In conclusion the same opinion says: "While a wide latitude must be given legislative discretion, and courts will not calculate to a nicety the exact expense of issuing licenses, there comes a point where the exaction is so palpably, so grossly, excessive that courts cannot close their eyes to the fact that such legislation is either taxation under the guise of regulation, or enacted in restraint of trade and for the purpose of prohibiting the conduct of the business."

The case with which we are dealing, being one involving taxation *and* regulation, does not fall precisely within the classification pointed to by the Michigan court. The opinions are cited to emphasize the duty of courts to look through a transparent legislative superstructure and determine when an Act rests upon an untenable base.

Although this Court's opinion in the Gray case was decisive of Act 186 on the points raised, it is interesting to note that the General Assembly of 1943 by Act 58 made certain changes. They are not important because Act 220 of 1945 is the final word. But the emergency clause in aid of Act 58 is a recognition that Act 186 was aimed at interstate business. By use of the term "intrastate" it shows a purpose to prefer one class of business at the expense of the other. Since the Act has been superseded its importance is that of illustration only.

The applicable Acts require that one who goes from house to house soliciting orders through sale of coupons, "or otherwise" shall procure a receipt from the County Clerk. This receipt may be cancelled by the Clerk upon a showing that it was obtained through fraud or misrepresentation. Section 4(a) of Act 186 fixes a tax of $150 per annum, payable in advance; (b) for each solicitor or

canvasser connected with the enterprise, $25 per year; (c) for each hundred portrait photographs or tintypes or fraction thereof, made or exposed within or without the corporate limits of any city or town in the county (whether the work shall be finished in this State or not), the sum of $10, payable on Monday of each week.

Although the emergency clause attached to Act 220 contains a finding that many citizens are being defrauded by unreliable itinerant photographers, no method of inspection is set up other than a direction to Prosecuting Attorneys (Act 186) to prosecute "all violations." Since the only violation would be failure to pay the license fees and taxes, the Acts are essentially a blockade against competition.

The judgment of conviction is reversed because the Acts are invalid.

In Cause No. 8312—*Roger West et al.* v. *A. L. Hutchins, Chancellor,* prohibition to St. Francis Chancery Court—this Court's order of June 30, 1947, is set aside for the reason that the subject matter has been disposed of by the opinion in the instant appeal.