

# THE ATTORNEY GENERAL

## OF TEXAS

### AUSTIN 11, TEXAS

PRICE DANIEL
ATTORNEY GENERAL

October 5, 1949

Hon. J. E. McDonald, Commissioner
Department of Agriculture
Austin, Texas                    Opinion No. V-922

Re: The constitutionality of
that part of House Bill
29, Acts 51st Legislature,
R.S.,1949, which empowers
the Texas Citrus Commission
to fix a tax levied on the
processing and sale of cit-
rus fruit.

Dear Mr. McDonald:

By letter dated July 28th you have requested
the opinion of this office on the following matter:

"The 51st Legislature of Texas created
a governmental agency, to be known as the Texas
Citrus Commission, under an act known as House
Bill No. 29.

"Under Section 14, the bill levies a tax
of 3¢ per 1-3/5 bushel unit to be collected
and used in part for advertising purposes.

"Section 17 of said act makes it the duty
of the Commissioner of Agriculture of the State
of Texas to collect said tax and remit same to
the Texas Citrus Commission.

"    . . .

"In view of the nearness of the citrus
harvesting season, I respectfully request your
opinion as to the constitutionality of that
part of the act which imposes a tax on citrus
fruit to be used for advertising purposes."

The Texas Citrus Commission was created and its
authority was defined by the 51st Legislature, R.S., 1949,
ch. 93, p. 150. It has as its motivating function the regu-
lation of the Texas citrus fruit industry. To finance the
regulatory measure and to provide funds for the accomp-

lishment of the authorized powers of the Commission, a tax was levied in the Act "upon all citrus fruit grown in the State of Texas and packed or placed in containers and marketed, or processed and sold between September 1st of each year and August 31st of the following year."

We set out the portions of the Act which pertain to the tax in question, as follows:

"Sec. 9. The Texas Citrus Commission in addition to those elsewhere enumerated, shall have the following powers:

"(1) To establish and maintain executive offices at such place within the citrus producing area of the State of Texas as it may from time to time select. The location of such executive offices may from time to time be changed by the Commission.

"(2) To employ and at its pleasure discharge experts, agents and such other employees, persons, firms and corporations as it may deem necessary and to fix their respective duties and compensation. Provided however, that all compensation proposed to be expended under said paragraph (2) shall be first approved by the Legislative Audit Committee.

"(3) To adopt and from time to time to alter, rescind, modify or amend all proper and necessary bylaws, rules, regulations and orders for the exercise of its powers and the performance of its duties under this Act, and to define more precisely the terms and words used in this Act and the applicability thereof to specific facts and circumstances and to prevent by orders, rules and regulations the evasion of the taxes as well as the other acts, rules and regulations of the Commission, which such rules, regulations and orders as so adopted, rescinded, modified or amended shall have the force and effect of law when not inconsistent with existing laws.

"(4) To act as the general supervisory authority over the administration and enforcement of this Act and the provisions there-

of and to exercise such other powers and to perform such other duties as may be now or hereafter imposed upon it by law.

"(5) To purchase all necessary office equipment, furniture and supplies and to make such contracts and incur such expenses as may be necessary or desirable to properly carry out its duties.

"(6) To conduct directly or through such instrumentalities or agencies as it may select, publicity and advertising programs and sales campaigns designed to increase the sale and consumption of Texas citrus fruit and by-products in an amount not to exceed one-half of the revenue of the Commission in any one year; to carry on research either directly or through such instrumentalities or agencies as it may select, for the purposes of increasing knowledge with respect to Texas citrus fruits and by-products and protecting Texas citrus from pests and dieases and of finding new uses for Texas citrus fruit and by-products and of improving the quality and yield of such fruit and by-products. No advertising or sales promotion campaign shall be directed towards promotion of the brands or trade names belonging to any particular person, firm or corporation, except as hereinafter provided.

"(7) To adopt, change, modify, register and own brands, labels, trade marks, trade names, and copyrights for use in connection with Texas citrus fruits and by-products and to adopt, alter, amend, and rescind rules and regulations governing the quality, kind and grade of products using same and conditions of such use and to prohibit the use of such brands, labels, trademarks, trade names and copyrights in connection with products which do not comply with such rules and regulations. All such brands, labels, trademarks, trade names and copyrights shall be open to use by all producers of Texas citrus fruit and by-products who comply with the rules and regulations promulgated by the Commission with respect thereto.

"(8) To borrow money for the purpose of carrying on the functions for which the Commission

was created, but no loan shall be for a greater amount than the reasonably anticipated revenues of the Commission for the current crop year in which such loan is made."

" . . .

"Sec. 14. There is hereby levied and assessed and there shall be collected, at the times and in manner and from the persons, firms, associations and corporations herein provided, a tax in such amount not to exceed Three Cents (3¢) per standard packed box or bag of one and three-fifths (1 3/5) bushels or equivalent, as the Texas Citrus Commission may annually fix and certify to the Commissioner of Agriculture of the State of Texas on or prior to September 1st of each year.

"With the exceptions herein provided, said tax at said rate is hereby levied and assessed and shall be collected as herein provided, upon all citrus fruit grown in the State of Texas and packed or placed in containers and marketed, or processed and sold between September 1 of each year and August 31st of the following year. If any citrus fruit shall be placed in containers or packed or processed in the State of Texas between September 1st of one year and August 31st of the following year but not sold until after the next September 1st, upon such sale it shall be taxed at the rate fixed by the Commission on or before the September 1st immediately preceding such sale.

"For the purpose of computing such tax, twenty-four (24) units of No. 2 cans of processed citrus fruit shall be equivalent to a standard packed box or bag of one and three-fifths (1 3/5) bushels of fresh fruit and shall be taxed in the same amount as such standard packed box; twelve (12) units of No. 3 cans of processed citrus fruit shall be taxed at a rate one and twenty-six one hundredths (1.26) times the amount of tax for a standard packed box; six (6) units of No. 10 cans of processed citrus fruit shall be taxed in the amount one and thirty-three one hundredths (1.33) times the tax for a standard packed box; seventy-two (72) units of six (6) ounce

cans of processed citrus fruit shall be equivalent to a standard packed box of fresh fruit and shall be taxed in the same amount; each one and three-fifths (1 3/5) bushel Bruce or wire-bound type box of fresh fruit shall be equivalent to a standard packed box of fresh fruit and shall be taxed in the same amount; each box, basket or bag containing approximately four-fifths (4/5) bushel of fresh fruit shall be taxed in an amount equal to one-half (1/2) the tax for a standard packed box; each box, basket or bag containing approximately two-fifths (2/5) bushel of fresh fruit shall be taxed in an amount equal to one-fourth (1/4) the tax for a standard packed box; each basket or bag containing approximately one (1) bushel of fresh fruit shall be taxed in an amount equal to sixty-two and one-half per cent (62½%) of the tax on a standard packed box; each box, basket or bag containing one-half (½) bushel of fresh fruit shall be taxed in an amount equal to thirty-one and twenty-five one hundredths per cent (31.25%) of the tax on a standard packed box; eight (8) bags containing approximately one-fifth (1/5) bushel each of fresh fruit shall be equivalent to a standard packed box and shall be taxed in the same amount; ten (10) eight (8) pound bags of fresh fruit shall be equivalent to a standard packed box of fresh fruit and shall be taxed in the same amount; sixteen (16) five (5) pound bags of fresh fruit shall be equivalent to a standard packed box and shall be taxed in the same amount; four and one-half (4½) gallons of single strength citrus fruit juice or other processed citrus fruit shall be equivalent to a standard packed box of fresh fruit and shall be taxed in the same amount;eighty (80) pounds of fresh fruit in bulk shall be the equivalent of a standard packed box and shall be taxed in the same amount as such standard packed box.

"For the purpose of computing such tax on other containers of fresh and processed Texas citrus fruit, and enforcing the collection of the taxes herein levied, the Texas Citrus Commission is authorized, empowered and directed to adopt rules and regulations to prevent

evasion and ensure collection and defining what
is the equivalent of a standard packed box of
fresh fruit, and the proportion of the tax as
levied per standard packed box which shall be
paid on such other forms and containers of
fresh and processed Texas citrus fruit.

"It is provided however that the tax levied
from year to year pursuant to the terms and pro-
visions hereof shall not be due and payable by
any natural person as to Texas citrus fruit grown
on land owned by such person and packed and sold
by such person as fresh fruit or as to such fruit
so grown on such land and processed and sold by
such person.  Each such natural person claiming
an exemption under the provisions hereof, shall,
before becoming entitled thereto, file an applica-
tion for such exemption and receive an exemption
certificate from Texas Citrus Commission at the
time and in the manner hereinafter provided.

"Sec. 15. The taxes authorized by the pre-
ceding Section of this Act shall be due and pay-
able (with the exceptions therein set out) by
the persons, firms or corporations packing or
placing same in containers and marketing such
fresh citrus fruit or processing and selling
such processed citrus fruit and citrus fruit by-
products, to the Texas Citrus Commission at its
executive offices, on the 15th day of the calendar
month following the packing or placing in contain-
ers and marketing of the fresh citrus fruit or
the processing and sale of the processed citrus
fruit and by-products, to which such taxes are
applicable.  Same shall bear interest at the rate
of ten per centum (10%) per annum from and after
the due date thereof until paid, and shall be per-
sonal obligations and claims against each person,
firm and corporation who packs or places in con-
tainers and markets or processes and sells or pur-
chases all or any part of such fresh citrus fruit
after it is packed for market or such processed
fruit and by-products after same are processed.
All persons, firms and corporations who shall
sell or purchase any fresh or processed citrus
fruit and by-products upon which such tax is or
may become due, shall keep such records and ac-
counts and make such periodic reports of dealings
in fresh and processed citrus fruit and by-products

as the Texas Citrus Commission may from time to time prescribe.

"  . . .

"Sec. 17. The Commissioner of Agriculture of the State of Texas, and his assistants, employees and agents are hereby authorized, empowered and directed at the request of the Texas Citrus Commission and without additional compensation to collect the taxes imposed by this Act and to remit same to said Commission as herein provided and to otherwise assist the Commission in the enforcement of this Act and rules and regulations promulgated hereunder. They shall make from time to time such reports of their collections and remittances and other activities in the enforcement hereof as may be required by said Texas Citrus Commission. Said Texas Citrus Commission may also employ additional agents and representatives for the collection of said taxes, and to assist in the enforcement hereof.

"The Texas Citrus Commission may require any or all persons who handle money or are responsible for collecting the taxes herein levied to give bond for the faithful and honest performance of their duties in such form and amount as may be prescribed by the Commission and the premiums on such bonds may be paid by the person giving same or from funds of the Texas Citrus Commission, as it may prescribe.

"Sec. 18. There is hereby created in the Treasury of the State of Texas three special funds which shall be continuing funds, to be known as follows:

"(1). Texas Citrus Commission Fund.
"(2). Agricultural and Mechanical College of Texas-Weslaco Experiment Station No. 15 Citrus Fund.
"(3). Texas College of Arts and Industries Citrus Fund.

"All moneys collected from the taxes levied from time to time pursuant to the provisions of this Act shall be turned over to the Texas Citrus

Commission, its officers and agents, and by said Commission forwarded to the Comptroller to be deposited by him with the State Treasurer of the State of Texas, three-fourths (3/4) thereof in said Texas Citrus Commission Fund, one-eighth (1/8) thereof in said Agricultural and Mechanical College of Texas-Weslaco Experiment Station No. 15 Citrus Fund and one-eighth thereof in said Texas College of Arts and Industries Citrus Fund and the proceeds of such taxes in said funds shall be appropriated by the Legislature of the State of Texas for the purposes herein named and for no other purpose.

"The entire amount of said Texas Citrus Commission Fund for the biennium ending August 31, 1951, is hereby appropriated to said Texas Citrus Commission, to be used by it for the purposes specified in this Act including the enforcement of this Act and cost of collecting said taxes. The entire amount of said Agricultural and Mechanical College of Texas-Weslaco Experiment Station No. 15 Citrus Fund and of said Texas College of Arts and Industries Citrus Fund for the biennium ending August 31, 1951, are hereby appropriated to the Agricultural and Mechanical College of Texas, Texas Agricultural Experiment Station System-Weslaco Experiment Station No. 15 and Texas College of Arts and Industries, each respectively to be used by said respective institutions in education and research for the purpose of increasing knowledge with respect to Texas citrus fruits and by-products, and protecting Texas citrus fruits from pests and diseases and of finding new uses for Texas citrus fruits and by-products and of improving the quality and yield of such fruit and by-products.

"Warrants shall be drawn by the Comptroller of Public Accounts of the State of Texas, against said respective funds as provided by law.

"   . . .

"Sec. 20. This Act is passed for the purpose of preventing economic waste of food and loss of property and natural resources of this State and

> to encourage and foster the development of a
> major industry, the Texas citrus industry by
> fostering research as to new uses; by prevent-
> ing destruction thereof by pests and diseases
> and by improving the quality of and stimulat-
> ing demand for, such Texas citrus fruit and
> by-products produced therefrom. Lack of such
> fostering care for such industry has in the
> past and will in the future (unless prevented)
> result in unnecessary and avoidable waste of
> an important resource of this State. Such loss
> and waste will imperil the ability of producers
> of Texas citrus fruit to contribute in appro-
> priate amounts to the support of ordinary gov-
> ernmental and educational functions, and in-
> crease the tax burdens of other citizens for
> the same purposes. Hence this Act is passed
> to further the public welfare and general pros-
> perity of the State of Texas."

We shall, in the course of this opinion, resolve the constitutionality of the tax imposed by the Act with respect to whether the tax is for a "public purpose" with-in the constitutional requirement of Article VIII, Section 3, of the Texas Constitution,and as to whether the delega-tion of authority to the Texas Citrus Commission in con-nection with determining the amount of the tax constitutes an unconstitutional delegation of legislative authority violative of Article II, Section I, and Article III, Sec-tion 48, of the Texas Constitution.

(1) Is the tax for a "public purpose" within the constitutional requirement of Article VIII, Section 3 of the Texas Constitution?

It is provided in Article VIII, Section 3 of the Texas Constitution that:

> "Taxes shall be levied and collected by
> general laws and for public purposes only."

The functions of the Texas Citrus Commission are enumerated in Section 9 of the Act, set out heretofore. In addition to the usual administrative functions of operating physical facilities and employing personnel as well as of furthering its regulatory powers, the Commission has speci-fic authority to conduct advertising campaigns to foster and promote the citrus industry. To this particular au-thority the following discussion will be principally devot-

ed, as its character as a public purpose is the most controversial of the enumerated powers in so far as the tax revenue's expenditure thereon is concerned.

The requirement that taxation be for a "public purpose" is fundamental to the jurisprudence of this country, and its necessity has been incorporated in the constitutions of most of the States of the union. It has, therefore, occasioned much judicial interpretation to determine what is within the field of authorized taxation. The volume of judicial constructions of what constitutes a "public purpose" within the inhibitory provisions has proven enlightening and we shall, through the course of this opinion, set out those expressions which we feel most nearly embody a recognizable rule.

The determination of whether a given object of taxation is for a "public purpose" is governed, in the light of existing authorities, by custom and usage to a great extent. No precise holding in Texas has been found holding that a tax on citrus fruit for the purposes enumerated in the Act in question is not for a "public purpose."

General tests, however, seem to be well established.

It is said in 1 Cooley on Constitutional Limitations (8th ed.,1927) 264, that:

"The Legislature is to make laws for the public good, and not for the benefit of individuals. It has control of the public moneys and should provide for disbursing them only for public purposes. Taxes should only be levied for those purposes which properly constitute a public burden. But what is for the public good, and what are public purposes, and what does properly constitute a public burden, are questions which the legislature must decide upon its own judgment, and in respect to which it is vested with a large discretion which cannot be controlled by the courts, except, perhaps, where its action is clearly evasive, and where, under pretense of a lawful authority, it has assumed to exercise one that is unlawful."

The United States Supreme Court has spoken on the problem often and forcefully. In Savings and Loan Association v. Topeka, 22 U.S. 455, 20 Wall. 655, it was said:

"To lay, with one hand, the power of the government on the property of the citizen, and with the other to bestow it upon favored individuals to aid private enterprises and build up private fortunes, is none the less a robbery because it is done under the forms of law and is called taxation. This is not legislation. It is a decree under legislative forms.

" . . .

"We have established, we think, beyond cavil, that there can be no lawful tax which is not laid for a public purpose. It may not be easy to draw the line in all cases so as to decide what is a public purpose in this sense and what is not.

"It is undoubtedly the duty of the Legislature which imposes or authorizes municipalities to impose a tax, to see that it is not to be used for purposes of private interest instead of a public use, and the courts can only be justified in interposing when a violation of this principle is clear and the reason for interference cogent. And in deciding whether, in the given case, the object for which the taxes are assessed falls upon the one side or the other of this line, they must be governed mainly by the course and usage of the government, the objects for which taxes have been customarily and by long course of legislation levied, what objects or purposes have been considered necessary to the support and for the proper use of the government, whether State or municipal. Whatever lawfully pertains to this and is sanctioned by time and the acquiescence of the people may well be held to belong to the public use, and proper for the maintenance of good government, though this may not be the only criterion of rightful taxation."

In Waples v. Marrast, 108 Tex. 5, 184 S.W.180 (1916), the question of whether the requirement of the expenditure of county funds for the holding of party primary elections was for a "public purpose" was involved. It was there said by Chief Justice Phillips that:

"Taxes are burdens imposed for the support of the government. They are laid as a means of

providing public revenues for public purposes. The sovereign power of the State may be exercised in their levy and collection only upon the condition that they shall be devoted to such purposes; and no lawful tax can be laid for a different purpose. Whenever they are imposed for private purposes, as was said in Brodhead v. Milwaukee, 19 Wis. 670, 88 Am. Dec. 711, it ceases to be taxation and becomes plunder.

"It is not easy to state in exact terms what is a 'public purpose' in the sense in which that term is employed as a limitation upon the State's power of taxation. The framers of the Constitution were doubtless sensible of this difficulty, for they did not attempt to define it. Many objects may be public in the general sense that their attainment will confer a public benefit or promote the public convenience, but not be public in the sense that the taxing power of the State may be used to accomplish them. The powers of the State as a sovereignty exist only for government purposes. They may be freely exerted in the discharge of all the governmental functions of the State; but cannot be applied to uses, though public in aim and result, which are not governmental in their nature. As the means provided for the support of the government in its administrative duties and existing alone for that end, the taxing power may be employed for no purpose save that which in a true and just sense is related to the performance by the State of its governmental office. The appropriation of the public revenue is a legislative power, and the Legislature must necessarily be allowed a large discretion in determining to what uses public moneys may be put. Subject to the constitutional limitation that the public revenue shall be applied to only public purposes, to the prudent husbandry of the Legislature as well as its provident foresight has been committed the public trust of making such use of it as will afford the economical administration of the government which both the spirit and the letter of the Constitution enjoin. The term 'public purpose' as used in this relation is not, therefore, to be construed narrowly, so as to deny authority to the Legislature

to make such provision for the administration
and support of the government in its several
branches and subdivisions as will faithfully
subserve the present and future interests of
the people. The limitation imposed by the
Constitution upon the power is, however, impera-
tive. And it is essentially true that it does
not permit taxation for all purposes which in a
broad and general sense may be regarded as pub-
lic, but expressly confines its exercises to on-
ly those public purposes with which the State,
as a government, invested with high and sover-
eign powers, but only as a grant from the people
and therefore to be solely used for the common
benefit of all of them, and not as a paternal
institution, may justly concern itself, and to
which, for that reason, the public revenues may
be rightfully devoted.

"As to what is a public purpose within the
meaning of Section 3, Article 8 of the Constitu-
tion, no better test can be presented than the
inquiry: <u>Is the thing to be furthered by the
appropriation of the public revenue something
which it is the duty of the State, as a govern-
ment to provide?</u> Loan Association v. Topeka, 20
Wall. 655, 22 L.Ed. 455; People v.Town of Salem,
20 Mich. 452, 4. Am. Rep. 400. Those things which
it is the duty of the State to provide for the
people, it is equally the right of the State, by
means of the public revenue, to maintain. With-
in this category fall the general instrumental-
ities of the government, the public schools,
and other institutions of like nature. But
the State is wholly without any power to levy
and appropriate taxes for the support of those
things which, either by common usage or because
they are in no proper sense the instruments of
government, it is the duty of the people to pro-
vide for themselves. It is not all things which
answer a public need or fill a public want that
it is within the authority of the State to fur-
nish for the people's use or support at the pub-
lic expense. Manufacturing industries, railroads,
public enterprises of many kinds, private schools
and private charitable institutions all afford a
service to the public, but the State is without
any power to maintain them. Religon is generally

esteemed a helpful influence for public moral-
ity. But the Constitution expressly declares
that no public money shall be granted in aid
of any religious organization." (Emphasis
supplied throughout this opinion)

In Neal v. Boog-Scott, 247 S.W. 689 (Tex.Civ.App.
1923), the court was passing on a tick eradication law as
being in contravention of the "public purpose" requirement
of Article VIII, Section 3, wherein the expense of enforce-
ment was required by the law to be paid out of county funds.
The Court held:

"The question as to whether an act of the
Legislature of this state will serve a public
use or purpose is, in the first instance, a
question for the determination of the Legisla-
ture, and that determination or decision can-
not be reviewed and the contrary determined by
the judiciary except in instances where the
legislative determination of the question is
palpably and manifestly arbitrary and incor-
rect."

The Texas courts have held that the following
functions were within the "public purpose" requirement:
the levy of taxes by a municipality for a Board of City
Development authorized to spend its funds to advertise
the advantages of the city, Davis v. City of Taylor,
123 Tex. 39, 67 S.W. 2d 1033 (1934); the levy of taxes
for the construction of highways, Tom Green County v.
Moody, 116 Tex. 299, 289 S.W. 381 (1926); the levy of
taxes to establish and maintain a municipal band,
Goodnight v. City of Wellington, 118 Tex. 207, 13 S.W.
2d 353 (1926); the levy of taxes for the payment of
bounties for the destruction of wolves, Weaver v.
Scurry County, 28 S.W. 836 (Tex. Civ. App. 1894). An
annotation of value is to be found in 112 A.L.R. 571.

We attach weight to the lucid expression of the
considerations involved in determining what is a
"public purpose" as found in City of Glendale v. White,
67 Ariz. 231, 194 P. 2d 435 (1948), as follows:

"'What is, and what is not, a public
purpose? It is fundamental that taxes may
not be levied for private purposes. * * *

"'"Public purpose" is a phrase perhaps incapable of definition, and better elucidated by examples.

\* \* \* \* \*

"'In considering what is properly a public purpose, we should not be controlled to too great an extent by decisions of courts in climates far distant from ours. Further, we should not be to too great an extent controlled by decisions which come from a remote time, and therefore may be out of tune with modern conditions. The question of what is a public purpose is a changing question, changing to suit industrial inventions and developments and to meet new social conditions. Law is not a fixed and rigid system, but develops, a living thing, as the industrial and social elements which form it make their impelling growth.'"

There being no Texas authority precisely in point, we deem it necessary to examine authorities in those jurisdictions which have been confronted with the levy of a tax for a purpose similar to that for the Texas citrus industry here involved. Numerous other States having various differing agricultural pursuits for substantial parts of their economies have enacted legislation regulating and fostering a particular agricultural pursuit similar to the Texas Act we are here considering involving our citrus industry.

In Floyd Fruit Company v. Florida Citrus Commission, 128 Fla. 565, 175 So. 248, 112 A.L.R. 562 (1937), the Supreme Court of Florida sustained an act of the legislature of that state levying a tax on each standard-packed box of oranges, grapefruit or tangerines grown in the state to be collected and used in advertising those fruits. The court held that such a tax is an "excise tax" and not a property tax and did not violate constitutional rules of equality, uniformity or due process, as provided in the Constitutions of Florida or of the United States; that such an excise tax was not unreasonable, unjustly discriminatory, or arbitrary; that the tax was levied on the privilege of turning said fruits into the channels of trade, and was a valid tax

regardless of whether they were later to be shipped in interstate or foreign commerce; and that the tax so imposed was for the purpose of advertising such citrus fruits and was for a public purpose and valid because the promotion of the citrus industry in Florida was a matter of public concern.

In Sligh v. Kirkwood, 237 U.S. 52 (1915), the Supreme Court of the United States took judicial notice of the fact that the raising of citrus fruits is one of the greatest industries of the State of Florida, and held that "it was competent for the legislature to find that it was essential for the success of that industry that its reputation be preserved in other states wherein such fruits find their most extensive market."

In Maxcy, Inc. v. Mayo, 103 Fla. 552, 139 So. 121 (1931), the Supreme Court of Florida said: "This court takes judicial notice of the fact that the citrus industry of Florida is one of its greatest assets. Its promotion and protection is of the greatest value to the state, and its advancement redounds greatly to the general value of the commonwealth."

In State ex rel. Graham v. Enking, 59 Idaho 321, 82 P. 2d 649 (1938), the Supreme Court of Idaho had under consideration a statute of that state levying a tax of one cent on each 100-pound unit of apples, prunes, potatoes and onions shipped within the state, for the purpose of providing a fund for advertising such fruits and vegetables. It was there held against the several contentions of invalidity that it was a tax on the privilege of turning such fruits and vegetables into the primary channels of trade and was not a property tax, and did not, therefore, violate constitutional rules of equality, uniformity or due process; that the tax was not a burden on interstate commerce; that the tax having been levied for the purpose of providing a fund for advertising such fruits and vegetables was valid and for a public purpose in that the protection and promotion of the apple, prune, potato, and onion industries was as much a matter of public concern to Idaho as the citrus industry was to Florida, citing Floyd Fruit Company v. Florida Citrus Commission, supra.

In Miller v. Michigan State Apple Commission, 296 Mich. 248, 296 N.W. 245 (1941), the Supreme Court

of Michigan had before it a statute of that state known as the "Baldwin Apple Act," which levied "an assessment of 1 cent per bushel, or 2 cents per 100 pounds of all apples grown and produced in Michigan, payable by the grower or grower's agent when shipped," and providing that "all moneys levied and collected under this Act shall be expended exclusively to advertise apples." The Act was sustained as a valid and constitutional exercise of the legislative power, as not being discriminatory, not a tax on property but on the privilege of putting apples in the marts of trade, and as being a tax for a public purpose.

In Louisiana State Department of Agriculture v. Sibille, 207 La. 877, 22 So. 2d 202 (1945), the Supreme Court of Louisiana was concerned with an act of the legislature of that state creating the Louisiana Sweet Potato Advertising Agency, imposing a tax to be collected by the Louisiana State Department of Agriculture and Immigration, on all sweet potatoes shipped in Louisiana. The Agency was charged with the duty of planning and conducting an advertising campaign for sweet potatoes out of the funds realized from such tax. The act was attacked under the Louisiana Constitution as not being levied for a public purpose. It was there held that the tax was "for a 'public purpose' since it redounds to the public welfare by promoting growth of an important agricultural industry."

Because of the similarity of the regulations and of the constitutional consideration, we feel constrained to set out an extensive portion of the language used in the case, as follows:

> "According to the evidence in the record, sweet potatoes, from the standpoint of acreage and value of production, constitutes the fourth largest, and one of the major, commercial crops of Louisiana, ranking only after sugar cane, rice and cotton. Corn is excepted from that classification since most of it is used on the farms where produced in feeding hogs, cattle and other animals. It is true that on the basis of percentage of acreage planted the sweet potato crop falls considerably behind the other three major commercial crops; nevertheless it is of great importance in the agricultural economy of this state as

is attested by the fact that during a ten-year period it had an average annual planting of 104,000 acres with an average annual yield of 7,185,000 bushels. Furthermore, in this connection, consideration is to be given to the agricultural trend in the southern section of our nation which is to favor diversified farming, thereby avoiding a concentration on one crop and preventing serious loss to the farmer in particular and the entire citizenry generally when the one crop fails."

With particular respect to the purpose of the act devoted to advertising sweet potatoes, the court noted:

"The proceeds of the sweet potato tax are not to be paid to the growers of that commodity or to any other individuals or groups that deal with it commercially; they are devoted exclusively to advertising the sweet potatoes, thus promoting the growth of an important and major industry. By that advertising, especially in states where very little is known of the value and usefulness of the sweet potato, there will result an increased consumption. This, in turn, will compel larger production and more sales throughout this state, as a consequence of which a greater prosperity will be realized not only by those directly interested but also by our entire citizenry. Therefore, since it redounds to the public welfare, the tax is for a public purpose."

The foregoing cited cases are indicative of the present judicial trend to uphold the type of tax imposed by the Texas Act in question as against constitutional objections, particularly as to its being for a "public purpose." The authorities are not without conflict, and we set out hereafter two comparatively recent cases to the contrary.

In Stuttgart Rice Mill v. Crandall, 203 Ark. 281, 157 S.W.2d 205 (1941), the Supreme Court of Arkansas considered an act passed in that State called the "Rice Development Commission Law," which levied a tax on rice milled within the state for the purpose of financing an advertising campaign to promote rice consumption. That act was passed contingent upon the

adoption of similar acts in Texas and Louisiana, which were in fact adopted in those states, the Texas Act being Acts 47th Leg., 1941, ch. 434, p. 695. It was held in the instant case that the Arkansas "Rice Development Commission Law" was unconstitutional under the Arkansas Constitution as not being for a public purpose. The basis of that holding is found in the following language:

"Broad use may be made of the state's police power; and if the treatment of rice by grower, miller, seller, or others dealing with it creates a hazard against which there should be protection, then,admittedly, any agency through which it passes may be subjected to regulation and a tax laid for the reasonable cost. But like corn, wheat, and all agricultural commodities of common use, rice is extremely wholesome. It contains no quality or element requiring that strict supervision which must be applied to products inherently harmful.

"The latest federal census of agriculture for Arkansas lists 1,428 rice farms, embracing 153,095 acres. The total of all farms in the state is 216,671, the acreage being 6,609,833. In point of numbers, rice farms account for .0066% of the total, and in acreage .023%.

"Can it be said that the interests of so small a group (although such farmers are among the more aggressive, progessive, and substantial of the state) are such as to call for protective intervention by the state's taxing powers on the theory that the common welfare is involved? That which is termed the logic of this contention is shredded by the facts."

In Lingamfelter v. Brown, ____ W. Va. _____, 52 S.E.2d 687 (1949), the Supreme Court of West Virginia held unconstitutional an act of the legislature of that state creating the West Virginia State Apple Commission and levying a tax on commercial apples grown in West Virginia and "moved into the channels of commerce" to conduct advertising campaigns to foster the apple industry, such tax being held not to be for a public purpose. That court cited the Florida Citrus Commission Case, the Michigan Apple Commission Case, the Idaho fruit and vegetable case, and the Louisiana Sweet Potato Commission

Case, but distinguished the West Virginia situation from those cases, as follows:

"We are not persuaded that the reasoning of the cases of C. V. Floyd Fruit Co. v. Florida Citrus Commission, supra; Michigan Sugar Co. v. Dix. supra; State v. Enking, supra, and Louisiana State Department of Agriculture v. Sibille, supra should be applied in this case. The principal reason for this conclusion is that the growing and moving of commercial apples in the State of West Virginia is not an enterprise or undertaking of such size as to impress it with a public interest. True, the growing of apples and the shipping of them into 'channels of commerce' is an important undertaking to the persons engaged in that business. Furthermore, it may be said that the undertaking or enterprise is important to the parts of the State where a considerable portion of the land is devoted to the growing of apples. But when appraised from the standpoint of the entire State the monetary returns from such business are, more or less, insignificant and are not sufficient to characterize that business as one of the principal commercial or agricultural enterprises of the State of West Virginia."

The obvious conclusion is that the determining factor in the case of an agricultural industry is the relative contribution to the agricultural economy of the taxing state made by the taxed agricultural industry.

The latest Texas Almanac, being that for the years 1947-1948, reveals pertinent facts concerning the Texas citrus industry. Texas grapefruit production of 24,000,000 boxes in 1945 placed it second only to Florida in such production. Average annual production from 1934 to 1943 has been over 12,000,000 boxes. Value of the 1946 grapefruit crop was $21,675,000, nearly half of all fruit and nut crops in the State. Texas ranked seventh in 1946 among the thirteen orange-producing states, the crop of that year being 5,500,000 boxes valued at $9,625,000. Through June, 1946, 36,513 carlots of citrus moved out of the Lower Rio Grande Valley. The Texas Extension Service estimated that late in 1946 there were 10,000,000 citrus trees in the Lower Rio Grande Valley. In the last ten years, utilization of citrus fruit has increased 350 per cent due primarily to processing of citrus. Boxes of grapefruit processed for juice increased from 20,000 in 1929 to 10,559,000 in 1945. According to information released by the United States Department of Agriculture, the value of citrus production in Texas in 1945 was $41,664,000, while the total value

of all field crops, fruits, nuts and truck crops produced in the State that year amounted to $745,290,000, which would make the citrus production 5.59% of the total crop production indicated. In 1947, the latest year for which conclusive figures as to production are available, citrus production totalled $18,041,000 as compared with the total value of all field crops, fruits, nuts, and truck crops amounting to $1,452,300,000, indicating a percentage of 1.24% allocable to citrus production.

It is pertinent also to recall the davastating winter freeze in the early part of 1949 which ravaged the citrus trees so tragically, rendering the industry peculiarly in need of assistance to foster its return to its previously held position in the agricultural economy of this State.

A further consideration is found in the fact that the legislative purpose in enacting the Texas citrus Commission Act, the statute we have here in question, is found in Section 20 of the Act, which reads:

"Sec.20. This Act is passed for the purpose of preventing economic waste of food and loss of property and natural resources of this State and to encourage and foster the development of a major industry, the Texas citrus industry by fostering research as to new uses; by preventing destruction thereof by pests and diseases and by improving the quality of and stimulating demand for, such Texas citrus fruit and by-products produced therefrom. Lack of such fostering care for such industry has in the past and will in the future (unless prevented) result in unnecessary and avoidable waste of an important resource of this State. Such loss and waste will imperil the ability of producers of Texas citrus fruit to contribute in appropriate amounts to the support of ordinary governmental and educational functions, and increase the tax burdens of other citizens for the same purpose. Hence this Act is passed to further the public welfare and general prosperity of the State of Texas."

Pertinent to the effect to be given the statement of the legislative purpose expressed in the Act, with reference to whether the tax be for a public pur-

pose, we cite the following from <u>Louisiana State Department of Agriculture v. Sibille</u>, supra:

"In enacting the statute in question the Legislature, in Section 1 thereof, declared that 'the production of sweet potatoes is one of the important agricultural industries of the State of Louisiana; that this act is passed to conserve and promote the prosperity and welfare of the State of Louisiana and of the sweet potato industry of the state and for fostering and promoting better methods of merchandising and advertising the sweet potatoes produced in this state. The purpose of this act is to expand the market and increase consumption of sweet potatoes by acquainting the general public with the health giving qualities and the food value of the sweet potatoes grown in the State of Louisiana, thereby promoting the general welfare of our people."

"The declaration that the act was passed to promote the prosperity and welfare of the State of Louisiana and of its people is an expressed legislative recognition that the tax is imposed for a public benefit. <u>To be sure that recognition is not conclusive; it could not make the tax one for public purpose if in fact it were for a private purpose. Since, however, the members of the Legislature are the direct representatives of all of the people of the State, their declaration certainly furnishes the presumption that the public generally is to be benefited by the levy.</u>"

Upon a careful consideration of all of the authorities and of the circumstances surrounding the citrus industry in Texas, we are of the opinion that the collection of the tax imposed for the purposes therein enumerated in Acts of 51st Legislature, 1949, ch.93, p.150, creating the Texas Citrus Commission, would not be violative of Article VIII, Section 3, of the Texas Constitution requiring that taxes be levied and collected for public purposes only.

It is necessary to note in this connection that in a previous opinion No. 0-3364, dated April 17, 1941 it was held by this office that a proposed "Citrus Advertising Law", introduced in the 47th Legislature, was unconstitutional as not being for a public purpose with-

in the requirement of the Texas Constitution, citing previous opinion No. O-3106 which held a proposed Rice Development Commission Bill, of the same Legislature, to be unconstitutional for the same reason. The rice opinion, No. O-3106, is distinguishable in that it was for another agricultural industry and also in that its legislative purpose was not stated in the bill as being for the general welfare of the people of the State. The Citrus Advertising Commission opinion, No. O-3364, is overruled in so far as the same conflicts with the holding of this opinion on the issue of the tax being levied and collected for a public purpose.

(2) <u>Does the delegation of authority to the Texas Citrus Commission in connection with determining the amount of the tax constitute an unconstitutional delegation of legislative authority violative of Article II, Section 1, and Article III, Section 48, of the Texas Constitution?</u>

We set out the pertinent provisions of the Texas Constitution on this consideration, as follows:

Article II, Section 1, provides:

"The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistry, to-wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted."

Article III, Section 48, provides:

"The Legislature shall not have the right to levy taxes or impose burdens upon the people, except to raise revenue sufficient for the economical administration of the government. . . ."

We do not think that the delegation to the Texas Citrus Commission of the power to fix the tax in question in an amount "not to exceed three cents (3¢)

per standard packed box or bag", constitutes an unconstitutional delegation of the power to tax. The <u>levy</u> of the tax is made by the Legislature, not the commission, while the *fixing of the amount - - not to exceed three cents - - is a ministerial function properly delegable to an administrative agency.*

Thus it is said in 1 Cooley on Taxation (4th ed. 1924) 195:

"After a tax is once levied or imposed, i.e., ordered to be laid, further proceedings, such as the extending, assessing and collecting the taxes, are administrative."

And in <u>Stratton v. Commissioners Court of Kinney County</u>, 137 S.W. 1170 (Tex. Civ. App. 1911, error ref.), we find:

"The general rule of constitutional law that a sovereign power conferred by the people upon one branch of the government cannot be delegated applies with peculiar force to the case of taxation. The taxing power is vested by the Constitution in the Legislature; and within that department of government lies the authority to prescribe the rules of taxation, and to regulate the manner in which those rules shall be given effect. The Legislature must in every instance prescribe the rules under which taxation may be laid. It must originate the authority under which, after due proceedings, the tax collector demands the contribution; but it need not prescribe all the details of action, <u>nor even fix with precision the sum to be raised or all the particulars of its expenditures.</u>"

To the same effect on another type of tax, see <u>Perry v. City of Rockdale</u>, 62 Tex. 451 (1884). And see an annotation in 70 A.L.R. 1232.

We therefore hold that the delegation of authority to the Texas Citrus Commission in connection with determining the amount of the tax is not unconstitutional as a delegation of the legislative power to levy taxes.

We refrain from passing upon the nature of the tax as concerning its distribution and also as concerning its collection from the grower. Those questions

Hon. J. E. McDonald, page 25 (V-922)

have not been asked and are not covered by this opinion.

SUMMARY

The tax levied under Acts 51st Leg.,R.S., 1949, ch. 93, p. 150, codified as Article 118d, V.C.S., for the establishment and operation of the Texas Citrus Commission, is not in violation of Article VIII, Section 3, of the Constitution of Texas which requires that taxes be levied and collected only for public purposes. Floyd Fruit Company v. Florida Citrus Commission, 128 Fla. 565, 17 So. 248 (1937); State ex rel Graham v. Enking, 59 Idaho 321, 82 P.2d 649 (1938); Miller v. Michigan State Apple Commission, 296 Mich., 248, 296 N.W. 245 (1941); Louisiana State Department of Agriculture v. Sibille, 207 La. 877, 22 So.2d 202 (1945).

The tax is not in violation of Article II, Section 1, or of Article III, Section 48, of the Constitution of Texas, as an invalid delegation of the taxing authority to an administrative agency. Penny v. City of Rockdale, 62 Tex. 451 (1884); Stratton v. Commissioners Court of Kinney County, 137 S.W. 1170 (Tex. Civ. App. 1911, error ref.); 1 Cooley on Taxation (4th ed. 1924) 195.

Yours very truly,

ATTORNEY GENERAL OF TEXAS

By Dean J. Capp
Dean J. Capp
Assistant

DJC:bh: gl

This opinion has been considered and approved in limited conference.

APPROVED

Price Daniel
ATTORNEY GENERAL